PRESCOTT *v.* LOCKE & A.

Where the contract is for an article coming under the general denomina-tion of goods, wares, or merchandise, the quantity required and the price being agreed upon, it is a contract of sale within the statute of frauds, although the subject-matter, at the time of making the contract, does not exist in goods, but is to be converted into that state subsequently by the maker and vendor; but if what is contemplated by the agreement is the peculiar skill, labor, or care of the maker, then the contract is one for work and labor, and not within the statute.

An article sold is at the risk of the buyer as soon as the contract of sale is perfected.   If the sale is of things which consist in quantity, and which are sold by number, weight, or measure, the sale is not perfect until the thing bargained for is counted, weighed, or measured, for until that time it is not apparent which are the goods that make the object of the sale; but the contract relates only to an object which is indeterminate, and which can be determined only by the measuring, weighing, or counting, and the risk cannot fall but upon some determinate thing.

This rule holds, not only when the sale is of a certain quantity to be taken from a larger bulk, but also when the sale is of the entire quantity, pro-vided it is made at the rate of so much the pound, measure, or number ; for the price being constituted only for each pound which shall be weighed, or for each number (as each hundred or thousand) which shall be measured, is not determined before the weighing or measuring.

Both the delivery and acceptance of the thing sold must be unequiv-
ocal in order to satisfy the requirements of the statute of frauds, and
place the thing sold at the risk of the buyer.
To constitute delivery so that the property bargained for will pass, nothing
must remain to be done concerning it by either party.
Where the existence of a contract is to be determined by the ascertain-
ment of the mutual understanding of the parties, evidence of the inde-
pendent understanding of each and every party to the contract is
admissible.

ASSUMPSIT, by Lorenzo G. Prescott against Locke & Jewell. First
count, on account annexed for 9,130 spokes, at $40 per thousand,
$365.20. Second count, for the same spokes bargained and sold.
Third count, for goods sold and delivered, labor performed, and mate-
rials provided.

By agreement, the case was tried by the court, who found the fol-
lowing facts:

The plaintiff had a saw-mill in Exeter; the defendants were partners
and builders of carriage wheels in Amesbury, Mass. In October, 1868,
the plaintiff and Locke made an oral agreement that the defendants would
buy of the plaintiff what walnut spokes he should saw at his mill, at $40
per thousand, to be delivered at the mill in lots of about 10,000 each,
subject to the defendants' selection. It was understood that the
plaintiff would not saw more than 100,000; that each lot was to be
paid for on delivery; that when the plaintiff had sawed about 10,000,
the defendants should cull them and take such as they selected; that
the plaintiff would saw them in the winter and spring months, about
10,000 a month; and that a lot of about 10,000 was to be delivered
about once a month. Nothing was said about counting them, but the
plaintiff understood that he was to count each lot selected by the de-
fendants, and the defendants understood that they were to count each
lot selected by them before they took them from the mill. The year
preceding, the defendants had purchased of the plaintiff about 27,000
spokes, which were selected by the defendants, counted by both parties
before they were removed from the mill, paid for by the defendants,
and carried by them to Amesbury. The first lot, under the agree-
ment of October, 1868, amounting to 10,000 or 12,000, was sawed by
the plaintiff; and the defendant Locke came to Exeter, Jan. 14, 1869,
and culled them, handling every spoke, throwing aside those rejected,
and laying those selected by him in a straight and compact pile.
Locke spent the day in doing this, and returned to Amesbury. It was
then understood that he would, if possible, send a team for the selected
pile Jan. 18, 1869, and take them away, and that they were to be paid
for the first of February. Jan. 16th and 18th, the plaintiff counted
the selected pile, handling them himself, and their number was 9,130;
and on the 18th of January, after counting them, he charged them to
the defendants in his book. By reason of the condition of the roads

it was impossible for the defendants to send for them until Jan. 22, 1869, when they were burned with the mill. The defendants never counted them, nor accepted the plaintiff's count of them, nor was the result of his count known to the defendants before the trial; but about six weeks after the fire the plaintiff called upon the defendants at Amesbury for payment for the lot selected, but rendered no bill of the number, and did not state the number. Subject to the plaintiff's exception, Locke was allowed to testify that when the bargain was made, and always afterwards, he understood that each lot of spokes were to be culled and counted by the defendants before they became theirs, and that he understood that the defendants had no right to take them away till they were culled and counted, though nothing was said between him and the plaintiff about this. Subject to the plaintiff's exception, Jewell, one of the defendants, was allowed to testify that he knew nothing about the bargain except what Locke told him, and that he understood at the time that the spokes were to be culled and counted by the defendants before they became theirs. Locke had previously testified that he understood he was to count the spokes before they were taken away. In the contract, the defendants did not rely upon any peculiar personal skill or labor of the plaintiff; and such skill or labor did not form any material part of the contract.

Upon this case such judgment is to be rendered, by agreement of parties, as the court shall order.

Case reserved.

*Smull* and *Wiggin,* for the plaintiff.

*Marston,* for the defendants.

FOSTER, J. The contract in this case was not for the plaintiff's labor, but was for the sale of merchandise to be subsequently manufactured.

It was not a contract to make spokes for the defendants; but it was an agreement that the defendants " would buy of the plaintiff what walnut spokes he should saw at his mill, at $40 per thousand " for the manufactured article.

Where the contract is for a chattel to be made and delivered, it clearly is a contract for the sale of goods. In such case the party supplying the chattel cannot recover for his labor in making it. If the contract be such that when carried out it would result in the sale of a chattel, the party cannot sue for labor; but if the result of the contract is that the party has done work and labor which end in nothing that can become the subject of a sale, the party cannot sue for goods sold and delivered. The case of an attorney employed to prepare a deed is an illustration of this latter proposition. It cannot be said that the paper and ink he uses in the preparation of the deed are goods sold and delivered. Per BLACKBURN, J., in *Lee* v. *Griffin,* 1 Ellis, Best & Smith 272.

Illustrations of the former proposition are : Where a carriage was ordered to be made, which would never, but for the order, have had an existence, but when made becomes the subject of sale.   This principle has been applied even to a contract for the making of a coat, a statue, a set of artificial teeth, from materials provided by the maker, even where the peculiar skill of the maker is considered to be an important element in the consideration of the contract ; for the value of the skill and labor, as compared with that of the material supplied, is not a criterion to determine what the contract is.

The true construction in this case is, that the contract was for the future sale of the spokes, when they should be in a state fit for delivery. The vendor, so long as he was sawing the timber and doing any other work preparing it for delivery in the form of spokes, was doing work for himself upon his own materials, and not for the defendants.   *Smith* v. *Surman*, 9 B. & C. 561.

Where the contracting parties contemplate a sale of goods, although the subject-matter at the time of making the contract does not exist in goods, but is to be converted into that state by the vendor's bestowing labor on his own raw materials,—that is a case of a contract for sale, within the statute of frauds.   *Garbutt* v. *Watson*, 5 B. & A. 612 ; *Smith* v. *Surman*, before cited.

This was a contract for the purchase of such walnut spokes as the plaintiff should saw at his mill, not exceeding 100,000, to be delivered at the mill in lots of about 10,000 each, subject to the defendants' selection.   It would be absurd to say that the defendants were to select the spokes before they had become the subject of sale,—prepared, by the previous work of the vendor, for the market.   The plaintiff was to convert the timber into spokes, and, when so converted, the delivery and acceptance thereof were to occur.   Until that time the contract would remain executory, and the title to the property would continue to be in the plaintiff.   If the plaintiff had caused or permitted the spokes to be improperly or imperfectly manufactured, or to be made from other than good walnut timber, the defendants would not have been bound to accept or pay for them.   *Gorham* v. *Fisher*, 30 Vt. 428.

Still the plaintiff would not necessarily lose the price of his labor. If the purchaser did not take the goods, others probably would.   The labor bestowed on them was in the line of his business, and we may reasonably infer that his labor would have been bestowed in the production of such goods had the contract not been made.   *Cason* v. *Cheely*, 6 Geo. 554.

It is very clearly settled by the more recent English and American cases, that it is not essential that the goods be capable of delivery at the time of making the contract, to bring it within the statute of frauds. *Pitkin* v. *Noyes*, 48 N. H. 298 ; *Finney* v. *Apgar*, 31 N. J. 266.

In *Pitkin* v. *Noyes* it is said, " If, however, a person contract to make and deliver, at a future time, certain goods at prices then fixed, or at reasonable prices, the essence of the agreement being that he will bestow his own labor and skill upon the manufacture, it is held not to be within

the statute;" and such is undoubtedly the law. In that case it was deemed proper to leave it to the jury, in view of all the circumstances of the case, to find whether the contract was essentially for the labor and materials of the defendant in raising the potatoes, so that he was bound himself to raise them, or whether it was substantially a sale of potatoes which he might raise himself, or procure by purchase or otherwise. The remark of the court that "it is obvious that the plaintiffs might have an interest in stipulating that the defendant should himself raise the potatoes" preceded this disposition of the case, and the considerations suggesting that remark apparently controlled the disposition of it.

We understand the expression quoted from *Pitkin* v. *Noyes* to mean, not precisely what is literally imported by it, but rather that it might be obvious that the plaintiffs might have an interest in stipulating that the potatoes should be raised upon the defendant's land, which might be regarded as peculiarly adapted to the raising of potatoes of a superior quality. And if that be the construction to be given to the remark, the consideration and the result were well enough.

But in the present case, it appears that it was no part of the essence of the contract that the plaintiff should, with his own hands and by the exercise of his own peculiar skill, manufacture these spokes, which the defendants were only bound to take after they had been culled out and selected by themselves.

This being a contract for the sale of chattels, we come, then, to the question whether there was such a delivery and acceptance of the spokes as transferred the property and title from the plaintiff to the defendants; for it is conceded that there was no part payment, earnnest, or memorandum given, within the terms of the statute of frauds. Gen. Stats., ch. 201, sec. 14. And therefore the plaintiff cannot maintain assumpsit founded upon the contract, either for goods bargained and sold, or for goods sold and delivered, without showing such delivery and acceptance as shall be sufficient to take the case out of the operation of the statute.

In his chapter entitled "At whose risk the thing sold is, during the intermediate time between the contract and the delivery," M. POTHIER discourses as follows: "Having established the principle that the thing sold is at the risk of the buyer as soon as the contract is perfected, it becomes necessary to inquire when the contract receives its perfection; and, generally, the contract of sale is considered to be perfect as soon as the parties are agreed upon the price for which the thing is sold.

"This rule holds when the sale is of a specific thing, and is absolute *(pure et simple): si id, quod venierit appareat quid, quale, quantum sit, et pretium, et pure venit; perfecta est emptio.*

"If the sale is of things which consist *in quantitate*, and which are sold by weight, number, or measure,—as, if one sells ten casks of the corn which is in a certain granary, ten thousand pounds of sugar, or one hundred carp, &c.,—the sale is not perfect until the corn is measured,

the sugar weighed, or the carp counted; for, until such time, *nondum apparet quid venierit.*

" It does not yet appear which is the corn, which is the sugar, or the carp, that makes the object of the sale, since that object can only be the corn that is to be measured, the sugar that is to be weighed, or the carp that are to be counted.

" It is true that before the measuring, weighing, or counting, and at the instant of the contract, the engagements which result from it exist. The buyer is then entitled to an action against the seller for a delivery of the thing, and the seller is entitled to an action against the buyer for a recovery of the price, upon offering to deliver it. [It will be borne in mind that the author, treating of the civil law, is not embarrassed by the consideration of the statute of frauds.] But, though the engagement of the seller subsists from that time, it may be truly said that it is not yet perfect, in this respect, that as yet it is only of an object which is indeterminate, and which can be determined only by the measuring, weighing, or counting. For this reason, until the thing is measured, weighed, or counted, it does not become at the risk of the buyer; for the risk cannot fall but upon some determinate thing.

" This rule holds, not only when the sale is of a certain quantity of merchandise, to be taken from a magazine which contains a larger quantity, because, in such a case, as we have seen, until the measuring or weighing, that which is sold does not consist of any determinate body or thing upon which the risk may fall; it also holds when the sale is of the entire quantity contained in a magazine or granary, provided it is made at the rate of so much the pound, or so much the measure, &c.

" The sale in this case is not considered as perfect, and the thing sold is not at the risk of the buyer, until it is measured or weighed; for, until that time, *non apparet quantum venierit.* The price, being constituted only for each pound which shall be weighed, or for each cask which shall be measured, is not yet determined, before the weighing or measuring; and consequently the sale, before that time, is not so far perfect that the risk of the thing may fall upon the buyer. He ought not to be charged with it until after the goods are weighed or measured.

" But if the goods are not sold by weight or measure, but *per aversionem,* that is, in bulk, and for a single and only price,—in such case the sale is perfect from the instant of the contract, and from that time these goods, the same as all others, are at the risk of the buyer."

The learned writer then proceeds to lay down certain rules for determining when the sale is considered as made *per aversionem,* and when by measure; and in the latter category he places the case where the price is expressly agreed upon for each measure; " whether the contract imports that it is of so many bushels of the grain in such a granary, at the rate of so much the bushel, or of a heap of grain,

which is in such a granary, and which contains a thousand bushels, at the rate of so much a bushel."

The sale is considered to be made *per aversionem* "when it is made for a single price, not of so many measures of such a thing, but of such a thing which is declared to contain so many measures."

In such case the expression of the number has no other effect than to oblige the seller to make an allowance for the defect of quantity. Pothier Contr. of Sale, secs. 309, 310.

Tried by these tests, which we believe to be sound, it is quite clear that the contract before us was for a sale by measure or count, and not a sale *per aversionem ;* and that the spokes were at the risk of the seller until the sale was perfected, which could not be so long as *non apparet quantum veniet.*

Now the question here is, Was this sale perfected, so as to pass the title to and impose the risk upon the purchaser ?

Whatever may have been the intention or understanding of either party, or of both, it must be controlled by the statute of frauds. The statute is highly beneficial, indispensable indeed ; and it must receive a favorable and liberal construction, *ut sit finis litium,* and to prevent perjury, and the mistakes and dangers resulting from evidence founded on imperfect memory.

By the terms of the statute, in the absence of part payment or a written memorandum, the buyer must "accept and actually receive" the property. It follows, therefore, that although, as matter of fact, in a particular case, there may be acceptance without delivery, or delivery and reception without acceptance, both conditions must be fulfilled before the title and risk can be transferred. And the acceptance must be clear and unequivocal. *Nicholle* v. *Plume,* 1 C. & P. 272.

In this case, the culling of the spokes was not an acceptance of quantity, but only of quality,—for then the quantity and price of the quantity was indeterminate ; still there was a manual caption of the spokes by the buyers, at the place of delivery. Such delivery and reception was not enough to transfer the title and risk, without an acceptance of the property as a determined quantity ; for such an acceptance depended upon a counting of the spokes.

But after the culling of the spokes by the buyers, the seller counted them, and charged them upon his book to the buyers. Whether this act of the seller can be regarded as a completion of the purchase, so as to transfer the title and risk to the defendants, may be a question to be governed by the understanding and intention of the parties. It must, of course, be a mutual understanding and intention ; otherwise it is no element in the contract. It is manifest that the defendants are not to be bound and concluded as to quantity, and consequently as to price, unless they have expressly or impliedly agreed to be so bound.

Upon this subject the case finds that nothing was said about counting the spokes. The plaintiff understood that he was to count each

lot selected by the defendants, and the defendants understood that they were to count each lot selected by them, before they took them from the mill; but it does not appear that both parties understood the defendants were to count the spokes. Still, if the defendants understood they were to count the spokes, it is manifest *they* understood that they were not to be bound by the plaintiff's count.

Could the plaintiff have understood the reverse of this? If so, would he not have rendered a bill of the quantity? The year preceding, the defendants had purchased of the plaintiff about 27,000 spokes, which were selected by the defendants and counted by both parties before they were removed from the mill. This fact would tend, in some degree, to show that the plaintiff, as well as the defendants, understood that the latter were not bound to accept the count of the former as true.

The evidence of both defendants was admissible, to show their independent understanding in this particular — *Graves* v. *Graves*, 45 N. H. 323 ; *Hale* v. *Taylor, ibid* 406 — provided such understanding does not come in conflict with legal principles or an express provision of law of superior and controlling effect. *Blake* v. *White*, 13 N. H. 272; *Hale* v. *Taylor*, before cited ; *Delano* v. *Goodwin*, 48 N. H. 206 ; *Cook* v. *Bennett*, 51 N. H. 85.

This is a question of the construction of the agreement between the parties; and it is clear that the parties have not expressed, by the terms of the contract nor by their acts, their intention in a manner that leaves no room for doubt. The intention, therefore, must be collected from the whole agreement and the conduct of the parties, and it must be governed by the settled legal rules of construction, if any such rules are found to be applicable.

Mr. Blackburn (Sales *151–3) has discovered two rules, which are in terms nearly equivalent to those in which they are laid down by Pothier as the rule of the civil law.

The first is, " where, by the agreement, the vendor is to do anything to the goods for the purpose of putting them into that state in which the purchaser is to be bound to accept them, or as it is sometimes worded, into a deliverable state, the performance of those things shall (in the absence of circumstances indicating a contrary intention) be taken to be a condition precedent to the vesting of the property."

The second is, that " where anything remains to be done to the goods for the purpose of ascertaining the price, as by weighing, measuring, or testing the goods,—where the price is to depend on the quantity or the quality of the goods,—the performance of those things, also, shall be a condition precedent to the transfer of the property, although the individual goods be ascertained, and they are in a state in which they ought to be accepted.

" Whilst the price remains unascertained, the sale is clearly not for a certain sum of money, and therefore does not come within the civilian's definition of a perfect sale, transferring the risk and gain of the thing sold." Blackburn on Sales *154.

To these Mr. Benjamin adds a third rule: " Where the buyer is, by the contract, bound to do anything as a condition, either precedent or concurrent, on which the passing of the property depends, the property will not pass until the condition be fulfilled, even though the goods may have been actually delivered into the possession of the buyer." Benjamin on Sales 222.

The substance of these three rules seems to be tersely expressed by Mr. Justice Story, thus: " To constitute delivery so that the property will pass, nothing must remain to be done concerning it *by either party*. *Barrett* v. *Goddard*, 3 Mason 111. Or thus, it is said: " The principle that runs through all the cases is, that when something remains to be done, as between buyer and seller, or for the purpose of ascertaining quantity or price, there is no delivery." *Rapelye* v. *Mackie*, 6 Cow. 253; *Fuller* v. *Bean*, 34 N. H. 300; *Warren* v. *Buckminster*, 24 N. H. 342; 2 Kent's Com. 496; *Russell* v. *Carrington*, 42 N. Y. 118; *Davis* v. *Hill*, 3 N. H. 382; *Barnard* v. *Poor*, 21 Pick. 378; *Hanson* v. *Meyer*, 6 East 614.

Such fact will generally be conclusive that there was no acceptance so as to bind the parties. Brown on Frauds, sec. 317.

Where the defendant orally purchased of the plaintiff a quantity of tares by sample, and left them on the plaintiff's premises, saying that he had no immediate use for them, and requested that they might remain there till he wanted to sow them, which was agreed to,—and afterward the tares were measured out by the agent of the plaintiff, and set apart in his granary, and ordered to be delivered to the defendant when he called, and the defendant afterward refused to take them, for which the action was brought,—the court of queen's bench nonsuited the plaintiff, holding that the defendant had not accepted the tares within the meaning of the statute. The decision seems to have gone upon the principle that the buyer would have the right, when the tares were tendered him, to reject them, as deficient in quantity or as not agreeing with the sample, a right which he could not be presumed to have waived. Brown on Frauds, sec. 324.

If a sale is not complete, if anything remains to be done concerning the property by either party, a present right of property does not vest in the buyer. If any condition precedent, such as the ascertainment of the quantity, and thereby of the gross price, is not performed or waived, the sale is not complete: such is the rule of the common law.

This rule may be abrogated by express agreement of the parties, but the intention to change it so that the title shall pass at once must be unequivocal and distinct; otherwise the construction required by the principles of law must overrule the possible intention. *Russel* v. *Carrington*, 42 N. Y. 118.

Measures to ascertain quantity or price may be agreed on, but tacitly waived, or expressly postponed or dispensed with. *Macomber* v. *Parker*, 13 Pick. 183.

But the rule is laid down in *Stone* v. *Peacock*, 35 Me. 388, thus: " Where some act remains to be done in relation to the property

which is the subject of sale, and there is no evidence to show any intention of the parties to make an absolute and complete sale, the performance of such act is a prerequisite to a consummation of the contract, and until it is performed the property does not pass to the vendee." *Ockington* v. *Richey*, 41 N. H. 275.

In *Fuller* v. *Bean*, Mr. Justice BELL said,—"There has been an inclination, in some cases, to regard a delivery as absolute when no condition is insisted on, and to consider such a delivery as a waiver of the condition. But this, we think, must depend on the intent of the parties, to be ascertained from all their language and conduct, and not from the single fact of delivery." "A mere assumption of ownership or control by the purchaser will not be sufficient evidence of a delivery, without proof of consent or acquiescence." And see *Kelsea* v. *Haines*, 41 N. H. 246.

In the present case, the spokes were to be taken by the defendants from the mill, and they were deposited in the place from which the defendants might remove them on the completion of the contract. But this fact alone would not constitute a delivery in law. The defendants had no right to remove them before the quantity and the price regulated by the quantity was ascertained.

An important act, the act of counting the spokes, remained to be done, in which both parties had the right to participate, unless that right was waived by the defendants. *Stone* v. *Peacock*, before cited.

Is there any evidence competent to be submitted to a jury, tending to show any intention of the parties to make an absolute and complete sale, delivery, and acceptance, without a compliance of the prerequisite condition of ascertaining the number of the spokes?

Is there any evidence of any waiver by the defendants of their right to participate in the important act of counting the spokes?

It appears that "the defendants understood they were to count each lot selected by them, before they took them from the mill." Is there any evidence that the plaintiff had not the same understanding?

It appears that the result of the seller's enumeration was never communicated to the buyers till long after this suit was brought. If it had been understood by the parties that the buyers were not to participate in the counting, it would naturally be required that, before removal to the defendants' mill, a statement of that count should be rendered in order that the buyers might verify it. The plaintiff could not expect the defendants to pay for the spokes until they knew how many they were to pay for. Suppose the plaintiff had charged the defendants with 10,000 spokes, and the defendants, at the time of loading them for removal, had discovered that the actual number was but 9,000, would they not have the right to reject the plaintiff's count, and revoke and repudiate the whole trade? If so, there was no prior irrevocable acceptance, to satisfy the terms of the statute. It can make no difference, in this respect, that the defendants might have a remedy against the plaintiff to compel him to make good a deficiency, ascertained after final acceptance. That is an independent consideration.

The remark of Lord ELLENBOROUGH, in *Hanson* v. *Meyer*, that " it certainly never was in the contemplation of the seller to waive the act of weighing any part of the commodity contracted for," is equally applicable to the present case.

Suppose the defendants had removed the spokes at the time they selected them from the common mass, we apprehend the plaintiff would not have considered himself bound to accept as true the *ex-parte* count of the defendants, made in his absence, without notice to him and an opportunity to verify the count before the removal of the property.

The fact is, the counting of the spokes was a material act, in which both parties were equally interested; and an *ex-parte* adjudication, so to speak, of a matter so material as quantity and price, must almost inevitably have led to the very results which the statute of frauds was intended to prevent.

Suppose a creditor of the defendants had attached these spokes while lying in the plaintiff's mill-yard, before they were counted by the defendants, it would not seem to be very strange if the plaintiff should insist that the sale was not perfected; and, again, the mischief which the statute tends to avoid would have been precipitated. These illustrations show the necessity of a rule which shall require the provisions of the statute to be applied, except in a strong and unequivocal case of manifest waiver of their requirements. The postponement of the day of payment, originally provided for, furnishes no indication of the renunciation of all the other prerequisites of a valid transfer of title.

It would be quite natural that the defendants should count the spokes at the time of loading them, as was in fact done the previous year. There would thus be an opportunity for the defendants to verify or to correct the plaintiff's enumeration before the removal of the property to the defendants' factory, where the spokes would be without the plaintiff's control for any purpose.

The act of charging the spokes upon the plaintiff's book has no significance. In the well known custom of merchants, such an act usually precedes the removal of the property.

Upon the whole, we fail to discover any evidence from which a jury would be at liberty to find a waiver of the defendants' right to insist upon a participation in a matter so material as the determination of the quantity of spokes; and we are of the opinion that, under the application of the recognized principles of law, it is incumbent upon us to hold that the sale was not perfected, and that the title to the property remained in the plaintiff at the time of its destruction.

Under the provisions of the case, there must be

*Judgment for the defendants.*